******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* JESSE CULBREATH
## (SC 20276)

McDonald, D'Auria, Mullins, Kahn, Ecker and Keller, Js.

*Syllabus*

In *State* v. *Purcell* (331 Conn. 318), this court determined, as a matter of state constitutional law, that, if a suspect makes an equivocal statement that arguably could be construed as a request for counsel, interrogation must cease except for narrow questions designed to clarify the equivocal statement and the suspect's desire for counsel, or, alternatively, the officers conducting the interrogation may inform the suspect that they understand the suspect's statement to mean that he does not wish to speak with them without counsel and that they will terminate the interrogation, and, in either case, if the suspect thereafter clearly and unequivocally expresses a desire to continue without counsel present, the interrogation may resume.

Convicted of manslaughter in the first degree with a firearm, criminal possession of a firearm, and carrying a pistol without a permit, among other crimes, the defendant appealed, claiming, inter alia, that certain statements he made during a custodial interrogation were improperly admitted into evidence because they were elicited by a detective, R, after he invoked his right to counsel, in violation of his state and federal constitutional rights. In response to a tip that that defendant was in possession of a firearm that had been used in a homicide earlier in the evening, the police stopped a vehicle in which the defendant and his girlfriend, T, were passengers. The driver consented to a search of the vehicle, and the police found a revolver in a box underneath the seat of the defendant, who was prohibited from possessing firearms or contacting T pursuant to a protective order. The police arrested the defendant and transported him to the police station, where R advised him of his rights under *Miranda* v. *Arizona* (384 U.S. 436). Before signing a written waiver form, the defendant asked R why the form stated "that I'm wavering . . . how I don't want the presence of an attorney or anything . . . ." R explained that signing the form meant that the defendant agreed to speak to R but that he could stop answering questions whenever he wanted, and the defendant signed the form. Approximately three hours into the interview, during which the defendant denied possessing the revolver or being involved in the shooting, the defendant asked R whether "there [was] anybody I can talk to . . . [l]ike an attorney or something . . . ." R responded that, if the defendant wanted an attorney, they would have to stop the interview. R also stated that, because attorneys "have to make their money," an attorney would probably prevent the defendant from speaking to R and giving his side of the story. R left the interview room for approximately twenty minutes to give the defendant time to consider. When R returned, the defendant inquired about T, who was being interviewed in another room, and R then resumed questioning the defendant. The defendant thereafter confessed to shooting the victim but claimed that he had acted in self-defense, and he signed a statement to that effect. At trial, the state sought to have the video recording of the interrogation and the defendant's written statement admitted into evidence, to which defense counsel replied he had no objection. The defendant subsequently testified that he had shot the victim but continued to maintain that he acted in self-defense. From the judgment of conviction, the defendant appealed. *Held*:

1. Defense counsel waived the defendant's unpreserved claim that his federal constitutional rights safeguarded by *Miranda* were violated by virtue of the admission of his written statement and the video recording of the interrogation, but did not waive the defendant's unpreserved claim under the state constitution: because the defendant's federal constitutional rights under *Miranda* and its progeny were well established at the time of his trial, defense counsel was presumed to have made a strategic decision when he waived the defendant's claim under the federal constitution by stating that he had no objection to the admission of the defendant's written statement and the video recording, and,

accordingly, the defendant's claim under the federal constitution failed under the third prong of *State* v. *Golding* (213 Conn. 233), as this court was unable to conclude that the alleged constitutional violation existed and deprived the defendant of a fair trial; nevertheless, because the binding precedent in effect at the time of the defendant's trial required his invocation of the right to counsel to be clear and unequivocal, and because this court's decision in *Purcell*, which held for the first time that the Connecticut constitution (art. I, § 8) provides greater protection with respect to a criminal defendant's *Miranda* rights than the federal constitution, was not released until nearly six months after the jury returned its verdict in the defendant's case, this court could not presume that defense counsel knew that the state constitution would subsequently be interpreted to provide an additional layer of prophylaxis, and defense counsel, therefore, did not make a knowing and intelligent waiver of the defendant's claim involving the state constitutional rule announced in *Purcell*.

2. The defendant's written statement and the latter portion of the video-recorded interview, after the defendant asked if there was "an attorney or something" he could speak to, should have been suppressed under article first, § 8, but the initial portion of the video recording, in which the defendant denied any involvement in the shooting, properly was admitted into evidence:

a. With respect to the defendant's initial inquiry about why the waiver form stated that he was "wavering," R sought clarification from the defendant, consistent with *Purcell*, and explained the meaning of the contents of the form before beginning the interview; accordingly, regardless of whether that inquiry could arguably be construed as a request for counsel, the defendant's express waiver of his *Miranda* rights following R's explanation of the form's contents manifested the defendant's clear and unequivocal desire to proceed with the interview without counsel present.

b. The defendant's question regarding whether "there [was] anybody [he could] talk to . . . [l]ike an attorney" was a conditional and equivocal inquiry that reasonably could be construed as a request for counsel, and R failed to stop the interview and to clarify whether the defendant desired the presence of counsel, in violation of the defendant's rights under article first, § 8: although R asked some questions to clarify the defendant's intent with respect to invoking his right to counsel, R went beyond the limited inquiry permissible after an equivocal request for counsel is made, as he plainly attempted to convince the defendant that it was against his interests not to continue the interview by stating that an attorney probably would not let him talk to R or tell his side of the story and by suggesting that an attorney's financial interest would induce the attorney to advise the defendant, contrary to the defendant's interests, to stop answering questions; moreover, after the twenty minute break, R did not limit his questions to narrow inquiries designed to clarify the defendant's desire for counsel but, rather, proceeded as if the equivocal request had never been made and simply resumed his questioning of the defendant, even though the defendant never clearly and unequivocally expressed a desire to continue without counsel present.

3. The state failed to satisfy its burden of establishing that the improper admission of the written statement and the inadmissible portion of the video-recorded interview, in which the defendant confessed to the shooting, was harmless beyond a reasonable doubt with respect to the defendant's conviction of manslaughter in the first degree with a firearm, and, accordingly, this court reversed the defendant's manslaughter conviction and remanded for a new trial on that charge: although the defendant testified at trial that he shot the victim, and that testimony was untainted by the state constitutional violation, the scope and content of the defendant's in-court testimony were not coextensive with his out-of-court statements, and the prosecutor relied substantially on the out-of-court statements, and discrepancies between them and the in-court testimony, to discredit the defendant's claim of self-defense, pointing to certain statements the defendant made to R to establish that he did not reasonably believe that the victim was using or about to use deadly physical force, or inflicting or about to inflict great bodily harm, and that he knew that he could avoid the use of deadly physical force with complete safety by retreating; moreover, the defendant's interview contained a significant amount of new material not heard from any other witness, and the prosecutor used that information in her closing

and rebuttal arguments to urge the jury to find that the defendant had fabricated his self-defense claim in response to certain suggestions made by R and to highlight an instance in which the defendant berated himself and called himself a "killer" while alone in the interrogation room, which, according to the the prosecutor, reflected the defendant's consciousness of guilt and undermined his claim of self-defense; furthermore, the prosecutor relied on the inadmissible out-of-court statements to undermine the defendant's credibility, emphasizing inconsistencies between those statements and his in-court testimony and urging the jury to find the defendant's testimony regarding justification unworthy of belief, and, because the defendant's credibility was critical to his self-defense claim in light of the absence of any eyewitness testimony or physical evidence to corroborate or contradict the defendant's account of the shooting, this court could not conclude that the defendant's in-court testimony obviated the harm caused by the improper admission of the inadmissible out-of-court statements; nevertheless, this court upheld the defendant's conviction of criminal possession of a firearm and carrying a pistol without a permit because the jury's verdict, as it related to those offenses, was not affected by the violation of the defendant's state constitutional rights, insofar as the inadmissible out-of-court statements were cumulative of the defendant's in-court testimony, in which he admitted to the essential elements of those offenses.

Argued December 8, 2020—officially released August 18, 2021*

*Procedural History*

Substitute information charging the defendant with the crimes of murder, criminal violation of a protective order, criminal possession of a firearm, carrying a pistol without a permit, and illegal possession of a firearm in a motor vehicle, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Gold, J.*; verdict and judgment of guilty of the lesser included offense of manslaughter in the first degree with a firearm, criminal violation of a protective order, criminal possession of a firearm, carrying a pistol without a permit, and illegal possession of a firearm in a motor vehicle, from which the defendant appealed to this court. *Reversed in part*; *new trial*.

*Julia K. Conlin*, assigned counsel, with whom was *Emily Graner Sexton*, assigned counsel, for the appellant (defendant).

*Samantha L. Oden*, deputy assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, former state's attorney, and *Debra Collins*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ECKER, J. A jury found the defendant, Jesse Culbreath, guilty of manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a, criminal violation of a protective order in violation of General Statutes § 53a-223 (a), criminal possession of a firearm in violation of General Statutes (Rev. to 2015) § 53a-217 (a) (4) (A), carrying a pistol without a permit in violation of General Statutes § 29-35 (a), and illegal possession of a firearm in a motor vehicle in violation of General Statutes § 29-38 (a). The defendant appeals from the judgment of conviction on the ground that his federal and state constitutional rights were violated when the police continued to question him after he invoked his right to counsel pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and, therefore, claims that his statements to the police improperly were admitted into evidence. The defendant further claims that the prosecutor committed improprieties during closing argument that deprived him of his due process right to a fair trial. We reverse in part the judgment of the trial court.

The record reflects the following facts and procedural history. On the evening of December 7, 2015, the defendant was selling marijuana on Judson Street in Hartford, when he encountered the victim, Richard Holloway, Jr. The defendant recognized the victim because they had been in an altercation when they were children. The victim began walking toward the defendant and "talking trash . . . ." A physical fight between the two men ensued, but nearby bystanders intervened and broke it up. Someone told the defendant "not to . . . pay too much" attention to the victim because he was drunk.[1] The victim quickly renewed the confrontation. He put on his jacket and "started coming back towards [the defendant] . . . ." The victim told the defendant "not to run" and that "he was going to get [him]." The defendant noticed "some fast hand movement" between the victim and "some other gentleman." Although the defendant did not see the victim with a weapon, he became worried that the victim might be armed. The defendant backed up, withdrew a revolver from his pocket, and shot the victim twice, once in the chest and once in the shoulder. The defendant fled the scene immediately after the shooting. The victim was transported to the hospital, where he died from the gunshot wounds inflicted by the defendant.

Later that night, a confidential informant, D,[2] called in a tip that someone named Pops, who subsequently was identified as the defendant, was in possession of a firearm that may have been used in a homicide earlier that evening. D reported that Pops could be found in a particular motor vehicle in the north end of Hartford. Around midnight, Hartford police officers spotted the vehicle near Weston Street. The police stopped the vehi-

cle and found D in the driver's seat, the defendant in the passenger seat, and the defendant's girlfriend, T, in the backseat. D consented to a search of the vehicle, during which the police found a revolver hidden in an ice cream box underneath the defendant's seat. The revolver contained four live rounds of ammunition and two empty shell casings. Upon further investigation, the police discovered that the defendant was in violation of a protective order, which prohibited him from contacting T and possessing firearms. The police arrested the defendant and transported him to the police station for further investigation.

At the police station, Detective Anthony Rykowski informed the defendant of his *Miranda* rights and asked him to sign a written waiver form.[3] Prior to signing the form, the defendant asked, "but why does it say that I'm wavering . . . um . . . saying how I don't want the presence of an attorney or anything?" Rykowski responded: "What this means is, right now, if you sign this, it just means you are agreeing to talk to us. Okay? Right now. Um, you know, again, what each one of these is is what your rights are, okay? This is the important one here: number five, you can stop answering questions or you don't have to answer questions if you don't want to. It's just, you know, there's a lot of things we need to get through about what happened tonight, but we can't talk unless you agree to talk to us right now." The defendant asked if he had to sign the waiver form "if [he] was agreeing to talk to [Rykowski] right now . . . ." Rykowski responded: "Right, right. But you have to understand that, if you sign it, you can stop answering questions whenever you want. That's what number five means. You know what I mean? . . . If you sign this, it doesn't mean you have to talk to me, you know? But it means we can talk." The defendant replied "[a]lright" and signed the waiver form. Rykowski began the interview, which lasted approximately eight hours.

At the beginning of the interview, the defendant denied possessing the revolver or being involved in the shooting on Judson Street. Instead, the defendant told Rykowski that, earlier in the evening, he had been shopping with T, who was pregnant with their child. The defendant continued to deny any involvement in the shooting incident over the next three hours.

Approximately three hours into the interview, the following exchange took place between the defendant and Rykowski:

"[The Defendant]: Is there anybody I can talk to?

"[Rykowski]: What do you mean?

"[The Defendant]: Like an attorney or something? Whatever the case may be. I know you guys gotta do your jobs.

"[Rykowski]: We do, yeah. Is that what you want?

"[The Defendant]: You know, I am not trying to add on more or anything.

"[Rykowski]: It doesn't add anything on, man. If that's what you want, that's fine, but we gotta shut this thing down if that's the case, you know. . . . If you want an attorney, then we can't talk right now anymore.

"[The Defendant]: Then what?

"[Rykowski]: Then we let the cards fall the way they will, you know. Like I said, the evidence is gonna tell a story. It's gonna tell what happened . . . . It's not gonna tell me the why or the who or the what reason. . . .

"[The Defendant]: [Indiscernible] know why you guys can't talk to me no more about what happened.

"[Rykowski]: I mean, I can ask your attorney to talk to you. He probably won't let me talk to you, you know.

"[The Defendant]: Why is that?

"[Rykowski]: It's that they have to make their money, do their thing. You know what I mean?

"[The Defendant]: I'm just trying to get this straight . . . .

"[Rykowski]: I understand, I understand. Do you want me to give you a few minutes?

"[The Defendant]: I guess.

"[Rykowski]: Well it's up to you man. If you want to keep talking, we'll keep talking. If you want an attorney, that's fine, we'll stop now.

"[The Defendant]: I'll take a few minutes."

Rykowski offered the defendant a drink and a cigarette, and then left the room. Approximately two minutes later, Rykowski's partner returned with a cigarette for the defendant. The defendant asked about T, who was being questioned in another interview room, and Rykowski's partner left to check on her. About twenty minutes later, Rykowski returned. The defendant again asked about T and what the police were "going to do with her . . . ." Rykowski stated: "[I]f she decides I wanna lie for you, then things can go one way . . . . If she does the right thing, they can go another way. . . . It's what I've been trying to explain to you this whole time, you know. Only one thing's going to work, and it's the truth . . . ." Rykowski left the interview room again, and, when he returned, the interview resumed. Rykowski told the defendant that "the clean get cleaner, and the dirty get dirtier," and that they were at a point where the defendant had to "decide . . . how [he] want[s] to move forward here . . . ." The defendant soon thereafter confessed to shooting the victim, but he explained that he had acted in self-defense because he was afraid the victim was going

to pull a gun on him. The defendant's confession was memorialized in a written statement, which the defendant signed.

The defendant was charged in an amended, five count information with murder, criminal violation of a protective order, criminal possession of a firearm, carrying a pistol without a permit, and illegal possession of a weapon in a motor vehicle. At the defendant's jury trial, the state offered into evidence the video recording of the defendant's interview and his written statement. Defense counsel stated that he had "[n]o objection" to the offer, and the video recording and written statement were admitted into evidence as full exhibits. The state also adduced ballistics evidence matching the revolver found underneath the defendant's seat with one of the bullets recovered from the victim's body, as well as forensic evidence matching the defendant's DNA profile to the DNA found on the handle grip of the revolver.

Following the state's case-in-chief, the defendant took the stand and testified in his own defense. His testimony, which we review in greater detail subsequently in this opinion, was largely consistent with what he told the police when he confessed to shooting the victim. The jury found the defendant not guilty of the crime of murder but guilty of the lesser included offense of manslaughter in the first degree with a firearm in violation of § 53a-55a. Additionally, the jury found the defendant guilty of criminal violation of a protective order, criminal possession of a firearm, carrying a pistol without a permit, and illegal possession of a weapon in a motor vehicle. The trial court rendered judgment in accordance with the jury's verdict and sentenced the defendant to a total effective sentence of thirty years' incarceration.[4] This appeal followed.[5]

On appeal, the defendant claims that his statements to Rykowski should have been suppressed because they were obtained in violation of his *Miranda* rights, which are guaranteed by the fifth amendment to the United States constitution and article first, § 8, of the Connecticut constitution. The defendant contends that he invoked his right to counsel at two separate points in the interview: first, when he questioned Rykowski about the waiver form at the outset and, second, when he asked if there was "an attorney or something" he could speak with approximately three hours later. Additionally, the defendant claims that the prosecutor made improper statements during closing argument in violation of his due process right to a fair trial.

The state responds that the defendant waived his federal and state constitutional claims when defense counsel explicitly stated that he had no objection to the admission of the video recording of the defendant's interview or his written statement. Alternatively, the state claims that no fifth amendment violation occurred because the defendant did not clearly and unequivocally

request counsel under *Miranda* and its federal progeny. With respect to the defendant's state constitutional claim, the state acknowledges that, pursuant to our recent decision in *State* v. *Purcell*, 331 Conn. 318, 203 A.3d 542 (2019), article first, § 8, of the Connecticut constitution "requires that, if a suspect makes an equivocal statement that arguably can be construed as a request for counsel, interrogation must cease except for narrow questions designed to clarify the earlier statement and the suspect's desire for counsel." (Internal quotation marks omitted.) Id., 362. Nonetheless, the state contends that the defendant's state constitutional rights were not violated because the defendant's first statement regarding the waiver form was not an equivocal invocation of the right to counsel, and, to the extent that his second statement asking about an attorney was equivocal, Rykowski complied with *Purcell* by stopping the interview and seeking clarification. In any event, the state contends that any constitutional violation was harmless beyond a reasonable doubt because there was overwhelming independent evidence of the defendant's guilt. Lastly, the state claims that the prosecutor's statements during closing argument were not improper and did not deprive the defendant of a fair trial.

I

The threshold question is whether the defendant waived his federal and state constitutional claims regarding the alleged violation of his *Miranda* rights. It is undisputed that the defendant failed to preserve these claims, and, therefore, he seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The state maintains that the defendant cannot prevail under *Golding* because defense counsel affirmatively waived the defendant's constitutional claims by stating that he had "[n]o objection" to the admission of the video recording of the defendant's interview and his written statement. We conclude that the defendant waived his federal constitutional claim but that the waiver of his state constitutional claim was not knowing and intelligent due to the recency of our decision in *State* v. *Purcell*, supra, 331 Conn. 318, which adopted a more protective prophylactic standard for *Miranda* rights under the Connecticut constitution.

In *State* v. *Golding*, supra, 213 Conn. 233, we held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) Id.,

239–40; see *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third prong of *Golding*). We conclude that the defendant has satisfied the first two prongs of *Golding* because the record is adequate for our review and the defendant's claims are of constitutional magnitude alleging the violation of a fundamental right.

A waived claim, as opposed to an unpreserved claim, "does not satisfy the third prong of the *Golding* test because, in such circumstances, we simply cannot conclude that injustice [has been] done to either party . . . or that the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial . . . ." (Internal quotation marks omitted.) *State* v. *Holness*, 289 Conn. 535, 543, 958 A.2d 754 (2008). It is well established that "[a] defendant in a criminal prosecution may waive one or more of his or her fundamental rights." (Internal quotation marks omitted.) *State* v. *Fabricatore*, 281 Conn. 469, 478, 915 A.2d 872 (2007). "The mechanism by which a right may be waived . . . varies according to the right at stake. . . . For certain fundamental rights, the defendant must personally make an informed waiver. . . . For other rights, however, waiver may be effected by action of counsel." (Internal quotation marks omitted.) *State* v. *Kitchens*, 299 Conn. 447, 467, 10 A.3d 942 (2011). "The fundamental rights that a defendant personally must waive typically are identified as the rights to plead guilty, waive a jury, testify [on] his or her own behalf, and take an appeal." *State* v. *Gore*, 288 Conn. 770, 779 n.9, 955 A.2d 1 (2008). In contrast, defense counsel may waive certain "tactical trial rights that are not personal to the defendant . . . as part of trial strategy"; id., 778–79; such as "the statutory protection of a probable cause hearing . . . the right to call witnesses . . . and the composition of a jury charge." (Citations omitted.) Id., 779 n.9; see also *State* v. *Kitchens*, supra, 467 (defense counsel may waive on defendant's behalf "the right . . . to proper jury instructions").

The decision to admit or exclude evidence on constitutional, statutory, or evidentiary grounds is the type of tactical trial decision that "appropriately may be waived by counsel acting alone . . . ." *State* v. *Gore*, supra, 288 Conn. 779 n.10; see *McCoy* v. *Louisiana*, U.S.     , 138 S. Ct. 1500, 1508, 200 L. Ed. 2d 821 (2018) ("[t]rial management is the lawyer's province: [c]ounsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence' "), quoting *Gonzalez* v. *United States*, 553 U.S. 242, 248, 128 S. Ct. 1765, 170 L. Ed. 2d 616 (2008); *United States* v. *Small*, 988 F.3d 241, 256 (6th Cir. 2021) (suppression of evidence for alleged constitutional violations is "the type of trial management [decision] that can be determined and thus . . . waived by the lawyer"), petition for cert. filed (6th Cir.

June 15, 2021) (No. 20-8361); *State* v. *Castro*, 200 Conn. App. 450, 458, 462, 238 A.3d 813 ("defense counsel knowingly and intentionally abandoned the defendant's sixth amendment right [of confrontation]" by expressly stating he had no objection to admission of ballistics report under *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)), cert. denied, 335 Conn. 983, 242 A.3d 105 (2020). As the United States Supreme Court explained in *Gonzalez*, "[g]iving the attorney control of trial management matters is a practical necessity. The adversary process could not function effectively if every tactical decision required client approval. . . . The presentation of a criminal defense can be a mystifying process even for well-informed laypersons. This is one of the reasons for the right to counsel. . . . Numerous choices affecting conduct of the trial, including the objections to make, the witnesses to call, and the arguments to advance, depend not only upon what is permissible under the rules of evidence and procedure but also upon tactical considerations of the moment and the larger strategic plan for the trial. These matters can be difficult to explain to a layperson; and to require in all instances that they be approved by the client could risk compromising the efficiencies and fairness that the trial process is designed to promote. In exercising professional judgment, moreover, the attorney draws upon the expertise and experience that members of the bar should bring to the trial process. In most instances the attorney will have a better understanding of the procedural choices than the client; or at least the law should so assume." (Citations omitted; internal quotation marks omitted.) *Gonzalez* v. *United States*, supra, 249–50.

To be effective, of course, defense counsel's waiver must be knowing and intelligent. See *State* v. *Bellamy*, 323 Conn. 400, 443, 147 A.3d 655 (2016) (observing that "waiver involves the intentional relinquishment or abandonment of a known right or privilege" in context of waiver by actions of counsel (internal quotation marks omitted)). This requirement ordinarily is met easily because it is presumed "that, in our adversary system, counsel was familiar with the relevant constitutional principles and had acted competently in determining that . . . the defendant's [constitutional] rights" were protected. Id., 418. Consequently, to demonstrate knowing and intelligent waiver, the state ordinarily is "not required to establish that defense counsel was aware of a possible constitutional claim in the factual scenario presented . . . ." Id. To demand more " 'would require the trial court to canvass defense counsel with respect to counsel's understanding of the relevant constitutional principles before accepting counsel's agreement on how to proceed . . . [and] there is nothing in our criminal law that supports such a requirement.' "[6] Id., 419, quoting *State* v. *Holness*, supra, 289 Conn. 544.

In the present case, the defendant's federal constitutional rights under *Miranda* and its progeny were well established at the time of trial, and we must presume that defense counsel was aware of the defendant's federal constitutional claim and made a strategic decision to waive it. Defense counsel affirmatively waived the defendant's federal constitutional claim when he explicitly informed the trial court and the state that he had "[n]o objection" to the admission of the video recording of the defendant's interview and his written statement. See *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 71, 967 A.2d 41 (2009) ("[w]hen a party consents to or expresses satisfaction with an issue at trial, claims arising from that issue are deemed waived and may not be reviewed on appeal" (internal quotation marks omitted)); *State* v. *Fabricatore*, supra, 281 Conn. 481 (defense counsel waived constitutional challenge to jury instruction by "clearly express[ing] his satisfaction with that instruction, and in fact subsequently argu[ing] that the instruction as given was proper"). We therefore conclude that the defendant's federal constitutional claim fails under the third prong of *Golding*.

We arrive at a different conclusion, however, with respect to the defendant's state constitutional claim because the law governing that claim changed after the defendant's trial. The defendant's trial took place in mid-2018; the jury returned its verdict on September 14, 2018. It was not until March 29, 2019, that we released our decision in *State* v. *Purcell*, supra, 331 Conn. 318, in which we held for the first time that article first, § 8, of the Connecticut constitution provides greater protection for a criminal defendant's *Miranda* rights than the federal constitution. See id., 359. *Purcell* explains the federal rule that governed prior to its issuance: "In *Davis* v. *United States*, 512 U.S. 452, 459–60, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994), the United States Supreme Court determined that, after a defendant has been informed of his *Miranda* rights, the police officers conducting a custodial interrogation have no obligation to stop and clarify an ambiguous invocation by the defendant of his right to have counsel present. Instead, they must cease interrogation only upon an objectively unambiguous, unequivocal invocation of that right. See id." (Footnote omitted.) *State* v. *Purcell*, supra, 320–21. In *Purcell*, we held that *Davis*' clear and unequivocal standard fails to satisfy the state constitution and that, "to adequately safeguard the right against compelled self-incrimination under article first, § 8, of the Connecticut constitution, police officers are required to clarify an ambiguous request for counsel before they can continue the interrogation." (Footnote omitted.) Id., 321. Thus, "our state constitution requires that, if a suspect makes an equivocal statement that arguably can be construed as a request for counsel, interrogation must cease except for narrow questions designed to clarify the earlier statement and the sus-

pect's desire for counsel. . . . Interrogators confronted with such a situation alternatively may inform the defendant that they understand his statement(s) to mean that he does not wish to speak with them without counsel present and that they will terminate the interrogation. In either case, if the defendant thereafter clearly and unequivocally expresses a desire to continue without counsel present, the interrogation may resume." (Citation omitted; internal quotation marks omitted.) Id., 362.

Because *Purcell* was released after the defendant's trial, we cannot presume that defense counsel knew that the state constitution would subsequently be interpreted to provide "an additional layer of prophylaxis to prevent a significant risk of deprivation of those vital constitutional rights protected under *Miranda*." Id., 342. Indeed, at the time defense counsel stated that he had no objection to the admission of the video recording of the interview and the defendant's written statement, the Appellate Court affirmatively had held that "our state constitution does not provide greater protection than the federal constitution in this context," and, "[a]s a matter of state constitutional law, interrogating officers are not required to clarify ambiguous or equivocal references to an attorney." *State* v. *Purcell*, 174 Conn. App. 401, 428, 166 A.3d 883 (2017), rev'd, 331 Conn. 318, 203 A.3d 542 (2019); see also id., 431 (The Appellate Court observed that this court "has consistently held that our self-incrimination and due process clauses do not afford greater protection than the federal due process and self-incrimination clauses. . . . As a result, our courts have previously declined to utilize our state constitution to afford suspects greater protections during custodial interrogations than the federal constitution affords." (Citation omitted.)). Given that the binding precedent in effect at the time of the defendant's trial required the invocation of the right to counsel to be clear and unequivocal, we conclude that defense counsel did not make a knowing and intelligent waiver of the "more protective prophylactic rule . . . required under the Connecticut constitution."[7] *State* v. *Purcell*, supra, 331 Conn. 321. Accordingly, the defendant's state constitutional claim was not waived.

II

We next address whether the defendant's rights under article first, § 8, of the state constitution were violated when Rykowski continued to question the defendant after he allegedly invoked his right to counsel. As we explained in part I of this opinion, in *Purcell*, we determined that the federal constitutional standard set forth in *Davis* v. *United States*, supra, 512 U.S. 459–60, requiring a suspect's invocation of the right to counsel to be clear and unequivocal, "does not adequately safeguard *Miranda*'s right to the advice of counsel during a custodial interrogation." *State* v. *Purcell*, supra, 331 Conn.

361–62. We therefore adopted a more protective standard under article first, § 8, of the Connecticut constitution, which requires questioning to cease after the advisement of *Miranda* rights "if a suspect makes an equivocal statement that arguably can be construed as a request for counsel . . . ." (Internal quotation marks omitted.) Id., 362. *Purcell* states that questioning may not resume once a defendant expresses such a request, "except for narrow questions designed to clarify the earlier statement and the suspect's desire for counsel." (Internal quotation marks omitted.) Id. Alternatively, "[i]nterrogators confronted with such a situation . . . may inform the defendant that they understand his statement(s) to mean that he does not wish to speak with them without counsel present and that they will terminate the interrogation." Id. In either scenario, questioning may not resume until "the defendant thereafter clearly and unequivocally expresses a desire to continue without counsel present . . . ." Id.

*Purcell* identified three categories of statements that are equivocal and arguably can be construed as an invocation of a suspect's right to counsel: (1) "statements regarding the assistance or presence of counsel [that] include one or more conditional or hedging terms, such as if, should, probably, or maybe"; id., 335; (2) "[s]tatements referring to counsel's advice that the defendant not speak to the police, if made after the defendant has agreed to waive his right to counsel"; id., 337; and (3) "[s]tatements that could be interpreted as an expression of the defendant's reservation about whether speaking to the police without counsel is in his best interest . . . ." Id., 338–39.

With these principles in mind, we address whether the defendant invoked his right to counsel under the state constitution during his custodial interview. See *State* v. *Anonymous*, 240 Conn. 708, 723, 694 A.2d 766 (1997) (whether defendant invoked right to counsel is question of law, reviewed de novo). First, the defendant contends that, prior to the commencement of the interview, he invoked his right to counsel when he asked Rykowski why the *Miranda* rights waiver form provided "that I'm wavering . . . um . . . saying how I don't want the presence of an attorney or anything . . . ." The state responds that the defendant's question was not an equivocal inquiry that arguably could be construed as a request for counsel but, instead, was a request for clarification of the *Miranda* rights waiver form.

We need not decide whether the defendant's first inquiry arguably could be construed as a request for counsel because the record reflects that Rykowski complied with the dictates of *Purcell* by seeking clarification from the defendant before beginning the interview. In response to the defendant's question regarding "wavering," Rykowski explained that, "[w]hat this means is,

right now, if you sign this, it just means you are agreeing to talk to us," and "you can stop answering questions or you don't have to answer questions if you don't want to . . . but we can't talk unless you agree to talk to us right now." When the defendant asked whether he had to sign the waiver form to talk to Rykowski, Rykowski responded in the affirmative but explained that the defendant could "stop answering questions whenever [he] want[ed]" and that "it doesn't mean [that he had] to talk," it just "means [that they could] talk." The defendant replied "[a]lright" and signed the waiver form. The defendant's express waiver of his *Miranda* rights following Rykowski's explanation manifested the defendant's clear and unequivocal desire to proceed with the interview without the presence of counsel. Importantly, the defendant does not claim that his waiver of his *Miranda* rights was not knowing, intelligent, and voluntary under the totality of the circumstances. On the present record, we conclude that the defendant's state constitutional rights were not violated and that the initial portion of the video recording of the interview, in which the defendant denied any involvement in the shooting, properly was admitted into evidence.

The defendant next claims that he invoked his right to counsel approximately three hours later in the interview, when he asked, "[i]s there anybody I can talk to . . . [l]ike an attorney or something?" The defendant's question about the availability of "an attorney" or someone else to "talk to" is precisely the type of conditional and equivocal inquiry that reasonably can be construed as a request for counsel. See *State* v. *Purcell*, supra, 331 Conn. 335–37; see also *People* v. *Sauceda-Contreras*, 55 Cal. 4th 203, 219, 282 P.3d 279, 145 Cal. Rptr. 3d 271 (2012) (defendant's statement " '[i]f you can bring me a lawyer' " was conditional and equivocal invocation of right of counsel, among other reasons, because "it began with an inquiry as to whether a lawyer could be brought to [the] defendant" (emphasis omitted)); *People* v. *Kutlak*, 364 P.3d 199, 206 (Colo. 2016) (defendant's inquiry whether he could " 'get [his lawyer] down here now' " was equivocal invocation of right to counsel because it was "unclear . . . whether he was actually requesting his lawyer or whether he was simply exploring the logistics and timing of possibly securing counsel's presence during the interrogation" (emphasis omitted)); *State* v. *Sanelle*, 287 Or. App. 611, 627, 404 P.3d 992 (2017) (defendant's question " '[w]here's the lawyer' " after he had been advised of his *Miranda* rights was equivocal because "a reasonable officer would have understood that [the] defendant may have been invoking his right to counsel"), review denied, 362 Or. 482, 412 P.3d 199 (2018). Accordingly, Rykowski had an obligation under article first, § 8, of the Connecticut constitution to stop the interview and to clarify whether the defendant desired the presence of counsel or, alterna-

tively, to terminate the interview altogether.

The state contends that Rykowski complied with *Purcell*'s "stop and clarify" rule by asking clarifying questions, such as "[i]s that what you want," and stopping the interview for approximately twenty minutes. We disagree for two reasons. First, although some of Rykowski's responses sought clarification of the defendant's intent to invoke his right to counsel, other responses plainly "attempted to convince the defendant that it was against his interests not to continue the interview." *State* v. *Purcell*, supra, 331 Conn. 362. Rykowski informed the defendant that, if he had an attorney present, the attorney "probably won't let me talk to you," and "the cards [will] fall the way they will" without the defendant telling the "story" of "the why or the who or the what reason."[8] See id., 327, 362 (The police officers attempted to convince the defendant that it was against his interests not to continue the interview by stating, among other things, " 'after today, you're never gonna be able to, to give me or any other cop your story. You're gonna let, a judge is gonna look at ya and say, some serious charges against you. You could go to jail for the rest of your life.' "). Furthermore, Rykowski's suggestion that an attorney's financial interest would induce the attorney to advise the defendant, contrary to the defendant's interests, to stop answering questions was entirely inappropriate.[9] We conclude that these statements exceeded the "limited inquiry permissible after an equivocal request for legal counsel . . . ." (Internal quotation marks omitted.) Id., 363.

Second, after pausing the interview to give the defendant some time to decide how he wished to proceed, Rykowski resumed questioning the defendant without clarifying the ambiguity in the defendant's prior inquiry regarding the availability of an attorney. We reject the state's contention that the defendant clarified his equivocal request for counsel by continuing with the interview after a twenty minute break. Rykowski stopped the interview to provide the defendant with time to decide whether he wished to have counsel present. When Rykowski returned, he did not limit his questions to "narrow" inquiries "designed to clarify" the defendant's "desire for counsel." (Internal quotation marks omitted.) Id., 362. Instead, after discussing the defendant's pregnant girlfriend, T, Rykowski proceeded as if the equivocal request had never been made and simply resumed questioning the defendant.[10] Because Rykowski continued to question the defendant even though the defendant never "clearly and unequivocally expresse[d] a desire to continue without counsel present"; id.; we conclude that he failed to comply with *Purcell*'s "stop and clarify" rule. Accordingly, the defendant's rights under article first, § 8, of the Connecticut constitution were violated, and the defendant's written statement and the latter portion of the video recording of the interview, in which the defendant admitted that he shot

and killed the victim, should have been suppressed.

### III

The question remains whether the admission of the defendant's written statement and the latter portion of the video recording of the interview was harmless. "If statements taken in violation of *Miranda* are admitted into evidence during a trial, their admission must be reviewed in light of the harmless error doctrine. . . . When an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt. . . . [W]e must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]." (Citations omitted; internal quotation marks omitted.) *State* v. *Mitchell*, 296 Conn. 449, 459–60, 996 A.2d 251 (2010). Whether the error was harmless depends on a number of factors, such as the importance of the evidence to the state's case, whether the evidence was cumulative of properly admitted evidence, the presence or absence of corroborating evidence, and, of course, the overall strength of the state's case. See, e.g., *State* v. *Tony M.*, 332 Conn. 810, 822–23, 213 A.3d 1128 (2019).

The defendant's written statement and the inadmissible portion of the video recording of the interview were of critical importance to the state's case. A confession is powerful evidence, and, without the defendant's admission that he shot the victim, the state's case was weak.[11] The question of harmless error in the present case is not so simply resolved, however, because the defendant's inadmissible oral and written confessions were followed by his testimony at trial, during which he took the stand and told the jury that he shot the victim. The defendant's in-court testimony is untainted by the prior constitutional violation.[12] In light of the defendant's in-court testimony, it was undisputed at trial that the defendant had shot and killed the victim; the issue to be decided by the jury was whether the defendant's use of deadly physical force was justified by the doctrine of self-defense.

We must decide whether the state has established, beyond a reasonable doubt, that the defendant's properly admitted, in-court testimony removed the harm caused by the improper admission of the video recording of the interview and his written statement. The question, more precisely, is whether the state has met its burden of proving that the jury's verdict would have been the same even if the defendant's inadmissible, out-of-court confessions had not been admitted into evidence. The problem for the state is that the scope and content of the defendant's out-of-court confessions and in-court

testimony are not coextensive. Furthermore, at trial, the state relied substantially on the additional information contained in the defendant's out-of-court confessions, as well as the discrepancies between the defendant's out-of-court confessions and his in-court testimony, to discredit the defendant's claim of self-defense. For the reasons that follow, we cannot conclude that the improper admission of the video recording of the defendant's interview and his written statement was harmless beyond a reasonable doubt.

The state may defeat a defendant's claim of self-defense involving deadly physical force, among other ways, by proving, beyond a reasonable doubt, that "(1) the defendant did not reasonably believe that the victim was using or about to use deadly physical force or inflicting or about to inflict great bodily harm; or (2) the defendant knew that he could avoid the necessity of using deadly physical force with complete safety by retreating . . . ." (Footnote omitted; internal quotation marks omitted.) *State* v. *Singleton*, 292 Conn. 734, 747, 974 A.2d 679 (2009). The state relied heavily on the defendant's inadmissible statements to Rykowski to fulfill its burden of disproving the defendant's self-defense claim at trial. For example, the state argued that the defendant did not subjectively believe that the victim was about to use deadly physical force or to inflict great bodily harm because the defendant told Rykowski that he " 'didn't know what [the victim] was gonna do,' " " 'wasn't scared per se,' " and was " 'not sure what [the victim] was reaching for or what his intentions were.' " The state further argued that the defendant knew he could have avoided the use of deadly force by retreating safely because the defendant told Rykowski that he " 'didn't really move,' " " 'wasn't trying really to get away,' " and " 'wasn't like fleeing from the fight, but . . . wasn't really trying to engage in it.' " Indeed, the state argued that "[t]he number one reason [the defendant] didn't retreat" was because he knew he had a " 'gun . . . in [his] pocket' " and he knew he "wouldn't lose a possible fight with [the victim] . . . ." None of these statements was elicited as part of the defendant's in-court testimony.

The prosecutor also urged the jury to find that the defendant had fabricated his claim of self-defense in response to a suggestion from Rykowski. Specifically, in closing argument, the prosecutor remarked: "[T]he defendant wants you to believe that he was justified in using deadly force because he was defending himself. But don't forget this defense was adopted by [the defendant] in his police interview when it was suggested by . . . Rykowski after three and [one-half] hours of denial. That's why he didn't swing for the fence. He'd adopted this thing of self-defense. So he didn't really know where he was going with it. [At] 4:31 [a.m. during the interview] . . . Rykowski suggests self-defense, that the victim acted like he had a gun. [At] 4:38 [a.m.],

[the] defendant says, 'Connecticut doesn't recognize self-defense'; he's corrected by the officer. [At] 5:18 [a.m., he] admits to killing [the victim]. And at the end of the interview, don't forget, he asks at 9:25 [a.m.], 'How does self-defense work?' And [the defendant] continued to embellish on . . . Rykowski's suggestion on self-defense even [at trial] . . . which, again, was more than two and [one-half] years after his initial eight hour interview."

The state further contended that the defendant's statements during the interview were evidence of his consciousness of guilt. Toward the end of the interview, when the defendant was all alone in the room, he berated himself, saying: "I'm the bad guy, I'm a killer. . . . [The victim] didn't deserve that . . . nobody do nothing to me." During its rebuttal argument, the state drew the jury's attention to these inadmissible remarks, arguing that they reflected the defendant's guilt and undermined his claim of self-defense. The state's frequent and repeated emphasis on the defendant's inadmissible statements during its closing and rebuttal arguments indicates that their admission was not harmless. See, e.g., *State* v. *Ayala*, 333 Conn. 225, 235, 215 A.3d 116 (2019) ("in evaluating harm [we] look to see how the state used [the inadmissible] evidence in its closing argument"); *State* v. *Sawyer*, 279 Conn. 331, 360–61, 904 A.2d 101 (2006) (finding harm, among other reasons, because state repeatedly emphasized improperly admitted evidence in its closing argument), overruled in part on other grounds by *State* v. *DeJesus*, 288 Conn. 418, 953 A.2d 45 (2008).

We recognize that the defendant's written statement and the inadmissible portion of his interview contained a good deal of the same information as his in-court testimony, but there were critical differences. Given the brevity of the defendant's in-court testimony and the length of the inadmissible portion of the defendant's interview, which lasted approximately four hours, the defendant's statements to Rykowski contained a significant amount of "*new* material, not heard from any other witness . . . ." (Emphasis in original.) *State* v. *Fernando V.*, 331 Conn. 201, 219, 202 A.3d 350 (2019). As we explained in the preceding paragraphs, this new material included evidence central to the defendant's claim of self-defense, such as the defendant's state of mind at the time of the shooting, the availability of a safe avenue of retreat, the defendant's misunderstanding regarding the validity of self-defense, and his personal belief that he was a "bad guy" and a "killer." "New evidence is not cumulative evidence." Id. The out-of-court statements contained information that was not included in the defendant's in-court testimony, and the state made use of that information in its closing and rebuttal arguments.

The state not only relied on the defendant's inadmissi-

ble statements as substantive evidence to disprove the defendant's claim of self-defense but also as impeachment evidence to undermine the defendant's credibility. During closing and rebuttal arguments, the state emphasized various inconsistencies between the defendant's inadmissible statements to Rykowski and his in-court testimony, and urged the jury to find the defendant's testimony regarding justification unworthy of belief. For example, the state pointed out that the defendant had provided conflicting explanations as to what he was doing before the shooting,[13] how he acquired the revolver,[14] what the victim said to him before the shooting,[15] how the revolver ended up in the ice cream box underneath his seat,[16] and whether he confessed to T.[17] Although the defendant's initial statements to Rykowski denying any involvement in the shooting were admissible, and may have affected the jury's assessment of his credibility, the state's focus on these additional discrepancies in the defendant's "story" even after he confessed to the shooting undoubtedly damaged his credibility further, perhaps beyond repair.

The defendant's credibility was critical to his self-defense claim because there was no eyewitness testimony or physical evidence to corroborate or contradict the defendant's account of the shooting. "[When] credibility is an issue and, thus, the jury's assessment of who is telling the truth is critical, an error affecting the jury's ability to assess a [witness'] credibility is not harmless error." (Internal quotation marks omitted.) Id., 223–24. We therefore cannot conclude that the improper admission of the defendant's written statement and the inadmissible portion of the interview was harmless beyond a reasonable doubt with respect to his conviction of manslaughter in the first degree with a firearm.

The state contends that the admission of the defendant's written statement and the latter portion of the interview was harmless because "the jury could have fully credited the defendant's testimony and reasonably still could have rejected his claim of self-defense" on the ground that the defendant "(1) did not see the victim with a weapon, and (2) was not even looking at the victim to see what he was doing when he fired his gun not just once, but twice." We agree that the jury could have fully credited the defendant's testimony and nonetheless rejected his self-defense claim by finding his use of deadly physical force to be unreasonable under the circumstances. But it is equally possible that the jury was persuaded by the state's argument that the defendant's testimony was unworthy of belief and that the defendant did not subjectively believe that the victim posed an imminent threat of great bodily harm or death. We do not know the basis for the jury's verdict, and that is the problem. It is unclear whether the jury's verdict rested on a permissible or an impermissible basis, and, under these circumstances, the state has failed to fulfill its burden of establishing that the

improper admission of the defendant's out-of-court confession was harmless beyond a reasonable doubt. See *State* v. *Montgomery*, 254 Conn. 694, 718, 759 A.2d 995 (2000) (improper admission of evidence obtained in violation of defendant's *Miranda* rights is harmless only if "it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible [evidence]" (internal quotation marks omitted)); cf. *Griffin* v. *United States*, 502 U.S. 46, 53, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991) ("[when] a provision of the [c]onstitution forbids conviction on a particular ground, the constitutional guarantee is violated by a general verdict that may have rested on that ground"); *State* v. *Cody M.*, 337 Conn. 92, 115–16, 259 A.3d 576 (2020) (in "cases involving multiple theories of guilt," constitutional error in jury instruction may be deemed harmless only "if the jury necessarily found facts to support the conviction on a valid theory"). Accordingly, we reverse the defendant's manslaughter conviction and remand the case for a new trial on that count. In light of our holding, we need not address the defendant's prosecutorial impropriety claim.[18]

We conclude that the improper admission of the defendant's statements was harmless, however, with respect to the defendant's conviction of criminal possession of a firearm and carrying a pistol without a permit because the defendant testified that he carried and possessed a firearm without a permit and with knowledge that he was subject to a protective order.[19] See General Statutes § 29-35 (a); General Statutes (Rev. to 2015) § 53a-217 (a) (4) (A); see also footnote 14 of this opinion. The defendant's in-court testimony admitting to the essential elements of these offenses was cumulative of the statements he made to Rykowski, and, therefore, the jury's verdict as it relates to these offenses was not affected by the violation of the defendant's state constitutional rights. Accordingly, we affirm the judgment of conviction in all other respects.

The judgment is reversed only with respect to the defendant's conviction of manslaughter in the first degree with a firearm and the case is remanded for a new trial on that count; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.

* August 18, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] An autopsy revealed that the victim's blood alcohol content was .252 at the time of his death.

[2] In accordance with federal law, we decline to identify any party protected or sought to be protected under a protective order or a restraining order that was issued or applied for, or others through whom that party's identity may be ascertained. See 18 U.S.C. § 2265 (d) (3) (2018).

[3] Rykowski's interview with the defendant was video-recorded.

[4] The trial court sentenced the defendant to thirty years' incarceration on the manslaughter count, five years of which was a mandatory minimum, and five years of incarceration for each of the remaining counts, all to run concurrently. Additionally, the court imposed a fine of $5000 in connection with the criminal possession of a firearm count, which was remitted.

[5] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

[6] " '[I]n circumstances in which defense counsel's waiver of a constitutional claim cannot be justified, that is, when the waiver constitutes a violation of the defendant's right to the effective assistance of counsel, the defendant may seek recourse through habeas corpus proceedings. Such proceedings are available to safeguard the constitutional rights of any defendant who has been prejudiced by the ineffective assistance of his or her attorney.' " *State* v. *Bellamy*, supra, 323 Conn. 419 n.14, quoting *State* v. *Holness*, supra, 289 Conn. 544 n.8.

[7] Although federal waiver law is in some respects "inconsistent with our jurisprudence, thus making a comparison of federal and Connecticut law extremely difficult, if not impossible"; *State* v. *Bellamy*, supra, 323 Conn. 435; we note that the federal courts of appeals also review claims affirmatively waived in the trial court when defense counsel's waiver was predicated on "then-binding precedent" that changed between the time of trial and direct appeal. *United States* v. *Johnson*, 981 F.3d 1171, 1178 (11th Cir. 2020); see id. (reviewing defendant's sufficiency of evidence claim for plain error because his "acknowledgement that the evidence he stipulated to was sufficient to satisfy the elements of the crime as laid out by then-binding precedent does not preclude him from asserting that the stipulation is not sufficient in light of the [United States] Supreme Court's subsequent issuance of *Rehaif* [v. *United States*, U.S. , 139 S. Ct. 2191, 204 L. Ed. 2d 594 (2019)]"); see also, e.g., *United States* v. *Nasir*, 982 F.3d 144, 173 n.35 (3d Cir. 2020) ("the [invited error] doctrine does not apply [when] the law changes between trial and appeal"); *United States* v. *Titties*, 852 F.3d 1257, 1264 n.5 (10th Cir. 2017) (agreeing with defendant that "the [invited error] doctrine does not apply when a party relied on settled law that changed while the case was on appeal"); *United States* v. *Coffelt*, 529 Fed. Appx. 636, 639 (6th Cir. 2013) ("[T]he [invited error] doctrine presupposes that the defendant has knowledge of the right that he or she is giving up. . . . Here, [the defendant] could not have known that he was relinquishing his right to be sentenced without consideration of his need for rehabilitation. It would be unreasonable, and perhaps unjust, to say this was an invited error when this precise action became prohibited under *Tapia* [v. *United States*, 564 U.S. 319, 131 S. Ct. 2382, 180 L. Ed. 2d 357 (2011)] two months *after* [the defendant] was sentenced." (Citation omitted; emphasis in original.)).

[8] The state relies on *Restrepo-Duque* v. *State*, Docket No. 63, 2015, 2015 WL 9268145 (Del. December 17, 2015) (decision without published opinion, 130 A.3d 340), cert. denied, 578 U.S. 1023, 136 S. Ct. 2413, 195 L. Ed. 2d 781 (2016), to support its contention that Rykowski's questions did not exceed the permissible bounds of clarification. We are not persuaded. In *Purcell*, we held that an officer's clarifying questions must be "narrow" and "designed to clarify the earlier statement and the suspect's desire for counsel." (Internal quotation marks omitted.) *State* v. *Purcell*, supra, 331 Conn. 362. We emphasized that questions that "[attempt] to convince the defendant that it was against his interests not to continue the interview" are not clarifying. Id. In contrast, in *Crawford* v. *State*, 580 A.2d 571 (Del. 1990), the Supreme Court of Delaware held that clarifying questions are impermissible only if they "coerce or intimidate the suspect or otherwise discourage his effort to secure counsel, if that is his intention. Nor may the police tender any legal advice or attempt to dissuade the suspect from pursuing an intended course." Id., 577. Pursuant to this standard, the court in *Restrepo-Duque* held that an officer's statement "importuning of [the defendant] to give his side of the story rather than invoke his right to counsel [was] troublesome," but not impermissible, because it was "not intimidating or coercive." *Restrepo-Duque* v. *State*, supra, *5. Although Rykowski's responses were not intimidating or coercive, they nonetheless attempted to convince the defendant that it was against his interest to continue the interview and, therefore, violated the more stringent standard that article first, § 8, of the Connecticut constitution imposes on the content of clarifying questions.

[9] The relevant portion of the colloquy proceeded as follows:
"[Rykowski]: I mean, I can ask your attorney to talk to you. He probably won't let me talk to you, you know.
"[The Defendant]: Why is that?
"[Rykowski]: It's that they have to make their money, do their thing. You know what I mean?"

[10] The state contends that the defendant reinitiated the interview by asking about T and, therefore, clearly and unequivocally expressed a desire to continue without the presence of counsel. See *Edwards* v. *Arizona*, 451

U.S. 477, 484–85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981) (after invocation of counsel, interrogation must cease "until counsel has been made available" or "the accused himself initiates further communication, exchanges, or conversations with the police"); see also *Oregon* v. *Bradshaw*, 462 U.S. 1039, 1045, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983) (suspect initiates further communication under *Edwards* by making statements that "represent a desire . . . to open up a more generalized discussion relating directly or indirectly to the investigation"). The state appears to claim that the defendant's questions about T "evinced a willingness and a desire for a generalized discussion about the investigation . . . ." *Oregon* v. *Bradshaw*, supra, 1045–46. We reject this claim.

Our review of the video recording reveals that the defendant did not summon Rykowski or ask to continue the interview; instead, Rykowski returned to the interview room and asked the defendant how he was doing. The defendant responded by asking whether Rykowski had "hear[d] anything about [T]" and what was "going to [happen] with her . . . ." The defendant explained that "[T] didn't do anything" and that he "want[ed] her to be able to go home." The defendant's questions about T did not invite a generalized discussion about the investigation; rather, they evinced his concern for the health and welfare of his girlfriend, who was pregnant with their child. We therefore conclude that the defendant did not reinitiate the interview. Instead, Rykowski reinitiated the interview by asking the defendant questions about the crimes under investigation without first clarifying whether the defendant desired the presence of counsel.

[11] Aside from the evidence linking the defendant to the gun used in the shooting, there was no evidence implicating the defendant in the victim's death other than the defendant's admissions.

[12] The defendant claims that we should disregard his in-court testimony because "it seems unlikely" that he would have testified "but for [the] improper evidence being presented to the jury . . . ." The defendant provides no analysis or authority in his initial brief to support this claim, and, therefore, we are constrained to conclude that it is briefed inadequately to permit meaningful appellate review. See, e.g., *Estate of Rock* v. *University of Connecticut*, 323 Conn. 26, 33, 144 A.3d 420 (2016) ("Claims are inadequately briefed when they are merely mentioned and not briefed beyond a bare assertion. . . . Claims are also inadequately briefed when they . . . consist of conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record . . . ." (Internal quotation marks omitted.)). Although the defendant "amplified [his] discussion of the issue considerably in [his] reply brief," it is well established that "we consider an argument inadequately briefed when it is delineated only in the reply brief." *Hurley* v. *Heart Physicians*, *P.C.*, 298 Conn. 371, 378 n.6, 3 A.3d 892 (2010). Because it is inadequately briefed, we cannot consider the defendant's claim that the trial court's failure to suppress the video recording of the interview adversely impacted the subsequent conduct of his defense at trial.

[13] At trial, the defendant testified that he was selling marijuana on Judson Street prior to the shooting, but he did not mention this fact to Rykowski.

[14] At trial, the defendant testified that he purchased the revolver approximately one week before the shooting, but he told Rykowski that the revolver " 'basically fell in [his] lap . . . .' "

[15] At trial, the defendant testified that the victim said "don't run," but he told Rykowski that the victim "kept telling [the defendant] to come with him around the corner . . . ."

[16] At trial, the defendant testified that D instructed him to put the revolver in the ice cream box, which D then placed underneath the defendant's seat. The defendant never mentioned this fact to Rykowski.

[17] At trial, the defendant denied telling T that he had killed the victim, but the defendant told Rykowski that he had confessed his involvement in the shooting to T.

[18] The defendant claims that the prosecutor made improper remarks (1) misrepresenting the evidence pertaining to the shooting and the defendant's claim of self-defense, (2) mischaracterizing the law of self-defense, and (3) informing the jury that the defendant had a "motive to lie," but Rykowski "had no motivation to lie." The first two categories of alleged prosecutorial improprieties apply only to the defendant's conviction of manslaughter in the first degree with a firearm. Because we reverse the defendant's manslaughter conviction and "do not view [these issues] as likely to arise on remand," we do not address them. *State* v. *Calabrese*, 279 Conn. 393, 413, 902 A.2d 1044 (2006). The third category of alleged prosecutorial impropriety also

applies only to the defendant's manslaughter conviction because the defendant's credibility was not at issue with respect to the other crimes of conviction. Indeed, there were no discrepancies between the testimony of Rykowski and the testimony of the defendant with respect to the essential elements of these crimes; the defendant testified that he possessed an operable revolver, without a permit, in a motor vehicle with T, and with knowledge that he was subject to a protective order. It is unclear whether the defendant will elect to testify at his new trial on the manslaughter count; see footnote 12 of this opinion; and, therefore, we cannot conclude that this issue is likely to arise on remand. See, e.g., *State* v. *Lebrick*, 334 Conn. 492, 521 n.16, 223 A.3d 333 (2020) ("[o]rdinarily, we do not decide constitutional issues when resolving those issues is not necessary to dispose of the case before us," unless "an issue with constitutional implications that has been presented and briefed by the parties is likely to arise on remand" (internal quotation marks omitted)).

[19] On appeal, the defendant does not challenge his convictions of criminal violation of a protective order and illegal possession of a firearm in a motor vehicle.

––––––––––––––––––––––––––––––––